Joseph M. **WALLS**, Defendant
Below, Appellant,

v.

**STATE** of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 21, 1989.
Decided: June 1, 1989.

Jerome M. Capone, Wilmington, for appellant.

Richard E. Fairbanks, Jr. and Timothy J. Donovan, Jr., Dept. of Justice, Wilmington, for appellee.

Before HORSEY, WALSH and HOLLAND, JJ.

HOLLAND, Justice:

Following a jury trial in the Superior Court, the defendant-appellant, Joseph M.

Walls ("Walls"), was convicted of one count each of First Degree Burglary, Second Degree Conspiracy, Terroristic Threatening, and Possession of a Deadly Weapon during the Commission of a Felony, and two counts each of First Degree Robbery, Second Degree Kidnapping, and Second Degree Assault. Identical charges, except for Terroristic Threatening, were brought against Efrain Hernandez ("Hernandez"), as a co-defendant. The same jury which convicted Walls was unable to reach a unanimous verdict with respect to Hernandez on any charge. A mistrial was declared as to Hernandez. This is Walls' direct appeal of his convictions.

Walls raises eight issues in this appeal. He argues through his attorney that: (1) the Superior Court erred, as a matter of law, in permitting his in-court identification by certain witnesses and thereafter by refusing to allow the jury to hear evidence that it had ruled that Walls' out-of-court identification by the same witnesses had resulted from an impermissibly suggestive police photographic line-up; (2) the Superior Court's decision to permit the introduction of his nicknames "Mad Dog" and "Wild Dog" into evidence by the State was improper and prejudicial; (3) the Superior Court committed plain error in failing to order, *sua sponte*, the severance of Walls' and Hernandez's trials; (4) the jury's failure to convict his co-defendant, Hernandez, precluded the State from proving a material element of the charges against Walls; (5) the evidence did not support a guilty verdict on the count of First Degree Burglary; (6) the prosecutor's closing arguments were improper and denied Walls a fair trial; (7) the evidence failed to support Walls' convictions of the Second Degree Kidnapping charges; and (8) the Superior Court improperly instructed the jury on the legal elements of the kidnapping charge.

In this appeal, the State acknowledges that the jury instruction on the kidnapping charge was incomplete. The State suggests that the incomplete nature of the instructions to the jury resulted in reversible error, with respect to the kidnapping charge. We have independently reviewed the Superior Court's instructions to the jury and reach the same conclusion. Therefore, Walls' convictions for Second Degree Kidnapping must be reversed. We find no merit in any of Walls' other contentions.

*Facts*

On the evening of December 14, 1985, the Pancoasts, Jeffrey, Anna, and their six-year-old son, Justin, were at home in their residence in Newport, Delaware.[1] A family friend, Dmytro Shevchenko, was with them. At approximately 8:45 P.M., there was a knock at the front door. Mrs. Pancoast opened the front door thinking that her father-in-law was there.

When Mrs. Pancoast opened the door, two strangers pushed their way into the house, knocking her into a table. One of the men was white, with reddish-brown hair and a beard. He was carrying a metal baseball bat. He was later identified by the Pancoasts as Walls. The other man was described as being dark complected, with a mustache. He had a hand gun. The Pancoasts later identified this man as Hernandez. Neither of the men wore a mask or disguised his face in any way.

Mr. Pancoast jumped up and demanded to know what was happening. Walls struck him on the head with the metal bat, causing a wound that was closed later with four sutures. Walls told Mrs. Pancoast to take her son and to sit on the sofa. The other man then held the handgun to Justin's head. He said that he would shoot Justin if anyone did not cooperate. He then ordered Mr. Pancoast and Mr. Shevchenko to face the wall.

Walls demanded money from both Mr. Pancoast and Mr. Shevchenko. Mr. Pancoast gave him twelve dollars that he had in his pockets. Mr. Shevchenko gave Walls his wallet, which contained more than four hundred dollars. The victims were told that they would be shot if they looked outside through the windows. The two

---

**1.** Anna and Jeffrey Pancoast, collectively, will be referred to in this opinion as "the Pancoasts"; individually, they will be referred to as "Mrs. Pancoast" and "Mr. Pancoast."

intruders then pulled the telephone wires out of the wall. As the strangers left the Pancoasts' home, one of them sarcastically said "Merry Christmas."

Approximately one week later, the Pancoasts saw Walls at a gasoline station near their home. They testified that when Walls saw them, he became "jittery." After he paid for his gasoline, Walls got into his car quickly and drove away. Although it was dark at the time, Walls did not turn on his automobile's headlights. Therefore, the Pancoasts were unable to see his license plate number. However, the Pancoasts testified that there was sufficient artificial illumination for them to see Walls' face before he got into his car.

Sometime in the middle of January, 1986, the New Castle County Police showed a photographic line-up to the Pancoasts[2] for the Caucasian man. The Pancoasts were shown the line-up at the same time, while seated next to each other. Mr. Pancoast identified Walls first from the photographs. Mrs. Pancoast then identified Walls from the same photographs. At a later date, the Pancoasts were shown another photographic line-up by the Newport Police. At that time, they both identified the photograph of Hernandez. The Pancoasts subsequently returned to the Newport Police station and were shown the same two photographic line-ups for a second time. Again, they both identified the photographs of Walls and Hernandez.

On February 7, 1986, the police executed a search warrant at Walls' home. The return of the search warrant did not reveal the discovery of any stolen items. However, a photograph of Hernandez and his brother, Carlos Hernandez ("Carlos"), was seized during the search. There was some writing on the back of the photograph addressed to Walls and his wife, Donna. The names "Wild Dog" and "Mad Dog" were also written on the back of the photograph.

Walls and Hernandez were jointly indicted, arrested, and tried together as co-defendants and co-conspirators. Both men asserted alibis as their defenses at trial. Hernandez testified that he was in New York at the time of the crimes. Walls testified that he was moving furniture into a new apartment with his sister's boyfriend.

At trial, the Pancoasts identified Walls and Hernandez as the perpetrators of the crimes in their home. Mr. Shevchenko was not able to identify Walls or Hernandez, with certainty, at the trial. Justin Pancoast was also unable to identify either of the defendants at trial, stating that he "forgot what they look like."

### In–Court Identifications

Walls and Hernandez both filed pretrial motions to suppress the out-of-court identifications of them that were made by the Pancoasts at the photographic line-ups. The Superior Court found that the photographic line-ups were impermissibly suggestive[3] and granted the motions to suppress. It held that the State would not be permitted to inform the jury of the results of those line-ups. However, the Superior Court held that the State could ask the Pancoasts to try to make in-court identifications of their assailants.

Walls' first argument on appeal is that the trial judge abused his discretion in permitting the Pancoasts to make in-court identifications of Walls. Furthermore, Walls asserts that the trial judge erred, as a matter of law, in refusing to permit the jury to know that he had ruled that the out-of-court identifications made by the

**2.** Mr. Shevchenko and Justin were never shown any photographic line-up.

**3.** The Superior Court ruled that the photographic line-ups, resulting in Walls' and Hernandez's identifications, were impermissibly suggestive because (a) the Pancoasts were shown the photographs at the same time, and even though Mrs. Pancoast made her own independent determination, she heard Mr. Pancoast's response before she responded; (b) the line-up was repeated at a subsequent occasion which ran the risk of amplifying the image the witnesses had of the defendants; (c) the line-up procedure used was generally too informal; (d) Hernandez's photograph had fifty percent more photographic surface than the average of the other photographs, making it "stand out"; and (e) Hernandez's photograph was labeled with the words "department of police".

Pancoasts were the result of an impermissibly suggestive photographic line-up and, therefore, inadmissible. Each of these arguments will be addressed separately.

■ Once the trial judge determines that a pretrial identification of a defendant is impermissibly suggestive, a question is always raised about whether a subsequent in-court identification of the same person is tainted and rendered unreliable. The resolution of this issue requires a determination, by the trial judge of "whether under the 'totality of the circumstances' the [in-court] identification was reliable even though the [prior] confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

■ The Supreme Court has set forth several factors which should be considered by a trial judge in ruling on the issue of the reliability of an in-court identification, which follows a pretrial procedure that was impermissibly suggestive. These factors are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *Harris v. State*, Del.Supr., 350 A.2d 768, 772 n. 7 (1975); *see also, United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967). The Superior Court noted that be-cause the Pancoasts had seen Walls at the time of the crimes[4] and at a gas station after the crimes occurred[5] but before the photographic line-ups were administered, the in-court identifications were reliable and not tainted by the photographic line-ups.

A conviction "based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *see also Younger v. State*, Del.Supr., 496 A.2d 546, 550 (1985). We find that the Superior Court conducted the proper legal analysis before concluding that, based on the totality of the circumstances, the Pancoasts could make reliable, independent in-court identifications of Walls. We also find that this ruling was supported by substantial evidence. Accordingly, we find that it was proper for the Superior Court to permit the Pancoasts to make in-court identifications of their assailants.

The next issue which Walls raises in this appeal also relates to the pretrial photographic line-ups. After the Superior Court ruled that the State would be permitted to ask the Pancoasts to try to make in-court identifications of their assailants, Hernandez's attorney moved for permission to inform the jury that, on several occasions prior to trial, the Pancoasts had been shown photographs of Walls and Hernandez by the police.[6] Walls' attorney joined in this motion and also asked the Superior Court to instruct the jury that, as a matter of law, it had ruled that the pretrial identification procedures were impermissibly suggestive. The prosecutor requested that

---

**4.** The Pancoasts observed Walls' face at the time of the crime in their living room. Walls did not wear a mask.

**5.** The Pancoasts also had an opportunity to view Walls at the gas station. This identification took place after the crimes were committed but *before* the suggestive photographic line-ups were administered. Therefore, this gas station identi-fication could not have been tainted by the suggestive photographic line-ups.

**6.** Hernandez's attorney represented that she wanted to be able to argue to the jury that the in-court identifications of the defendants by the Pancoasts had been tainted by the pretrial photographic presentations.

if the jurors were to be informed that the Pancoasts had been shown photographs of Walls and Hernandez prior to the trial, that he be permitted to introduce this evidence during the State's case-in-chief.[7]

■ The Superior Court ruled that defense counsel (Hernandez's attorney), during her opening statement, could mention that the Pancoasts had seen photographs of the defendants prior to trial. The Superior Court also ruled that, during its case-in-chief, the State could inform the jury that prior to trial "the witnesses were provided with the photographs of the defendants" and "other people ... similarly situated," and could introduce the actual photographs that were shown to the Pancoasts, if the State so desired. However, the Superior Court denied the motion by Walls' attorney to inform the jury that it had previously held that the out-of-court photographic line-ups were impermissibly suggestive and to instruct the jury on the circumstances it had found to be impermissibly suggestive in the photographic line-ups. The Superior Court did agree to instruct the members of the jury that it was for them to decide whether or not the pretrial view of the photographs affected the Pancoasts' in-court identifications.

We find no error in the manner in which the Superior Court permitted the parties to present evidence of the pretrial photographic line-ups to the jury. The defense request that the jury be informed that the Pancoasts had previously seen photographs of Walls and Hernandez was granted. The State was permitted to inform the jury that the Pancoasts viewed the defendants' photographs with photographs of similarly situated people. Any party was permitted, as well, to introduce into evidence the actual photographs viewed by the Pancoasts.[8]

We also find no error in the jury instructions which were given with respect to the in-court identifications.[9] The jury instructions given by the trial judge permitted the jury to conclude that the pretrial view of the photographs affected the witnesses' in-court identifications of the co-defendants. Alternatively, the instructions also permitted the jurors to find that the witnesses had a basis, independent of the photographs, to make the in-court identifications. Thus, the jury instructions which were given made the reliability of the Pancoasts' in-court identifications a question of witness credibility. "It has long been our law that the jury is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980). The Superior Court properly left it for the jury to determine whether or not the Pancoasts' in-court identifications were reliable.

### Admissibility of Nickname Testimony

During its cross-examination of Donna Walls, the wife of defendant Walls, the State asked her what nicknames she had heard Walls and Hernandez call each other. Walls' attorney objected to the question on the grounds of relevancy. The State responded that it was attempting to establish the depth of the friendship between Walls and his co-defendant Hernandez. The objection was overruled. The State was per-

---

7. The prosecutor represented that he wanted to inform the jury himself "so that it doesn't seem like shocking evidence ... kept from their attention."

8. The actual photographic arrays used in the line-ups were not introduced into evidence by any party.

9. In pertinent part, those instructions were:
 Testimony has been presented in this case that one or more of the witnesses have reviewed a photograph of each defendant among a group of photographs. You are permitted to conclude or not conclude that this pretrial view of photographs has affected the witnesses' in-court identification. However, if you find that the witnesses had an independent means to have made an in-court identification, then you may rely or not rely on the in-court identification, depending on all of the circumstances.
 . . . .
 [Y]ou must, of course, be satisfied beyond a reasonable doubt that the defendant has been properly identified and was indeed the one that did the act charged,.... If there is any doubt about this identification, then you must give that defendant the benefit of such doubt, and find him not guilty.

mitted to ask the question, and the following exchange took place:

STATE: By what nicknames have you heard your husband and Frank [Efrain] Hernandez call each other?

DONNA WALLS: Joe is [sic] known as Wild Man for awhile.

STATE: Wild Man. Have you ever heard him called Wild Dog?

DONNA WALLS: Occasionally.

STATE: How did that come about, do you know?

DONNA WALLS: No sir.

STATE: And who is it that calls him Wild Dog?

DONNA WALLS: Family.

STATE: Have you ever heard Frank [Efrain] Hernandez call him Wild Dog?

DONNA WALLS: No.

On appeal, Walls contends that the trial judge abused his discretion in permitting the introduction of this testimony. Walls argues that this line of questioning constituted prosecutorial misconduct, and was unduly prejudicial to his case.

■ In support of the propriety of the question, the State argued at trial that the depth of the relationship between Walls and Hernandez was relevant to its case. First, according to the State, it was more likely that friends, rather than strangers or casual acquaintances, would act together in a serious criminal enterprise. Second, the State argued in the Superior Court that since the Pancoasts testified that the men who committed the crimes were strangers to them, identification was an issue in the case. Therefore, according to the State, the Pancoasts' identifications of their assailants, as two individuals who knew each other well enough to call each other by nicknames, added to the credibility of those identifications.

"A decision whether to admit testimony as relevant is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *Baynard v. State*, Del.Supr., 518 A.2d 682, 692 (1986) (citing *Lampkins v. State*, Del.Supr., 465 A.2d 785, 790 (1983)). We do not find that the trial judge abused his discretion in this case by permitting the State's question about Walls' nicknames.[10] *A fortiori* the State's question was not impermissible as a matter of law. *Cf. Bowe v. State*, Del. Supr., 514 A.2d 408, 411 (1986).

### Severance of Co-defendant's Case

Walls argues on appeal that his co-defendant, Hernandez, presented an antagonistic defense and that the Superior Court erred in failing to sever the co-defendant's trial. "Severance is a matter within the sound discretion of the Trial Court; and the defendant has the burden of demonstrating 'substantial injustice' and unfair prejudice." *Lampkins v. State*, Del.Supr., 465 A.2d 785, 794 (1983) (citing *Bates v. State*, Del.Supr., 386 A.2d 1139, 1141 (1978)). *See also Wiest v. State*, Del.Supr., 542 A.2d 1193, 1195 (1988). This Court has stated that:

What constitutes abuse of discretion depends upon the facts and circumstances of each case.... Ordinarily, an abuse of discretion will not arise from the mere fact that the [statements or evidence] of a co-defendant implicating the moving defendant and not admissible against him, will be introduced at the joint trial. Some other factors must be present, such as: (1) absence of other substantial, competent evidence of the movant's guilt; (2) antagonistic defenses as between the co-defendant and the movant; and (3) difficulty of segregating the evi-

10. When the police executed a search warrant at Walls' home, they found and confiscated a photograph of Hernandez and his brother, Carlos. On the back of the photograph, there was writing that included the nicknames "Mad Dog" and "Wild Dog." The State attempted to introduce the photograph into evidence in its case-in-chief, to show that Walls' possession of the photograph indicated that he knew Hernandez, supporting the State's theory that they committed the crimes together. Over the objection of Walls' attorney, the trial judge admitted the photograph into evidence. However, the trial judge ruled that the writing on the back of the photograph had to be covered because there was no evidence regarding who wrote the message. To allow the jury to see the message, without any evidence as to who wrote the message would have been, according to the trial judge, "unduly prejudicial."

dence as between the co-defendant and the movant.

*Jenkins v. State,* Del.Supr., 230 A.2d 262, 272–73 (1967) (citations omitted).

Walls' trial counsel did not file a motion for a severance in the Superior Court. When a party has "not raised and not fairly presented" a question to the trial court, this Court will generally decline to review the issue on appeal. *Probst v. State,* Del. Supr., 547 A.2d 114, 119 (1988); Supr.Ct. Crim.R. 8. Therefore, we must ascertain whether the Superior Court's failure to sever the co-defendants' trials, *sua sponte,* was erroneous as a matter of law, and, if so, whether that error so affected Walls' substantial rights that it should be accorded review by this Court, notwithstanding its nonassertion at trial. *Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100, *cert. denied,* 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986); Supr.Ct.Crim.R. 8.

In this case, both Walls and his co-defendant, Hernandez, (1) denied committing the offenses; (2) presented separate alibi defenses; and (3) claimed to be the victims of misidentification. Even in this appeal, Walls does not contend that either he or Hernandez offered evidence that was antagonistic to the other's defense during the course of the trial. Walls' argument that Hernandez presented an antagonistic defense rests solely upon a portion of the closing argument to the jury which was made by Hernandez's attorney.

■ In her closing argument, Hernandez's attorney directed the jury's attention to the photograph of both Carlos and Efrain Hernandez that had been found at Walls' house. The State had introduced the photograph into evidence, as proof that Walls and his co-defendant were acquainted. Hernandez's attorney used that same photograph to suggest to the jury that it was Carlos, not her client, who more closely matched the description of the second robber which had been given by the victims. Therefore, Hernandez's attorney argued the Pancoasts may have mistaken her client for his brother, Carlos Hernandez.

We have reviewed the record. We find that none of the factors enunciated in *Jenkins* are present in this case. When Hernandez's attorney asked the jury to consider the photograph, she was attempting to raise a reasonable doubt in the minds of the jurors, as to Hernandez's guilt. The record reflects that in the context of this case, Hernandez's innocence was not antagonistic to Walls' defense. We find that Walls has failed to demonstrate unfair prejudice or a substantial injustice from his joint trial with Hernandez. Accordingly, we find no abuse of discretion and no plain error in the Superior Court's failure to sever, *sua sponte,* the trials of Walls and Hernandez. *Cf. Brittingham v. State,* Del.Supr., 559 A.2d 1234 (1989).

## *Mistrial of Co-defendant Immaterial to Conviction of Walls*

Walls and Hernandez were charged jointly in a ten-count indictment. Nine of the ten counts named both Walls and Hernandez.[11] One of the counts (terroristic threatening) named only Walls. At the conclusion of the trial, the jury returned verdicts of guilty as charged against Walls on all counts, but with respect to Hernandez was unable to reach a unanimous verdict on any of the charges. The Superior Court declared a mistrial as to Hernandez.

Walls first contention is that the State's failure to convict Hernandez amounts to an error of law which requires the reversal of his convictions. That contention is premised upon the fact that in nine of the ten

11. For example, Count II of the Indictment, for First Degree Robbery charged:
ROBBERY FIRST DEGREE in violation of Title 11, Section 832 of the Delaware Code of 1974, as amended.
JOSEPH M. WALLS and EFRAIN HERNANDEZ, on or about the 14th day of December, 1985, in the County of New Castle, State of Delaware, when in the course of committing theft, did threaten the immediate use of force upon Jeffrey Pancoast with intent to compel the said Jeffrey Pancoast to deliver up property consisting of United States currency and when in the course of the commission of the crime, EFRAIN HERNANDEZ displayed what appeared to be a deadly weapon, to wit: a handgun.

counts of the indictment charging Walls, the State alleged that both he *and* Hernandez committed the particular crimes. Thus, Walls argues that Hernandez's guilt was a material element in establishing Walls' guilt and that the State needed to prove, beyond a reasonable doubt, that *both* he and Hernandez committed each of the crimes charged.

The United States Supreme Court has held that the due process clause of the United States Constitution requires the prosecution to prove every element of the crime with which a defendant is charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). If the prosecution fails to sustain that burden on any element of the crime, the defendant must be acquitted of that charge. *Id.* at 364, 90 S.Ct. at 1072. However, within our federal constitutional scheme of government, each state has the authority to define, by statute, the elements of each offense that will constitute criminal conduct within its jurisdiction. *See Patterson v. New York*, 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322–23, 53 L.Ed.2d 281 (1977).[12] The first issue which is raised by Walls requires an analysis of what effect, if any, a joint indictment has on the foregoing principles.

 The joinder of defendants in one or more counts of an indictment is permissible if, as here, "they are alleged to have participated in the same act or transactions ... constituting an offense or offenses." Super.Ct.Crim.R. 8(b). Nevertheless, each of the counts in a joint indictment operates as a separate, individual count against each named co-defendant. *State v. Mastriacchio*, 71 R.I. 72, 42 A.2d 496, 498 (1945). *See also* J. Moore, 8 *Moore's Federal Practice* ¶ 8.06 (2d ed. 1989). Thus, to convict Walls of the charges set forth in a joint indictment, the State's burden was the same as it would have been if Walls had been indicted individually, i.e., proof beyond a reasonable doubt of the statutory elements of each crime with which Walls was charged. *Cf. Harley v. State*, Del. Supr., 534 A.2d 255, 257 (1987). The due process clause of the federal Constitution does not require the prosecution to prove beyond a reasonable doubt the existence of facts which do not bear on the defendant's guilt. *See McMillan v. Pennsylvania*, 477 U.S. 79, 84–85, 106 S.Ct. 2411, 2415–2416, 91 L.Ed.2d 67 (1986). We find that the joint indictment filed against Hernandez and Walls did not make Hernandez's guilt a material element of any of the crimes for which Walls was convicted at their joint trial.

Walls argues alternatively that, even if Hernandez's guilt was not a material element to each charge in the joint indictment, his robbery and conspiracy convictions were inconsistent with the jury's failure to convict Hernandez on those same charges. The issue of verdict inconsistency has been recently addressed by this Court in the context "of whether a jury's verdict directed to separate counts of the indictment [against a single individual] must be consistent with each other." *Tilden v. State*, Del.Supr., 513 A.2d 1302, 1306 (1986). In *Tilden*, this Court held "the rule of jury lenity finds proper application in cases of verdict inconsistency in this State" and " 'a criminal defendant is afforded protection against jury irrationality or error by [an] independent review of the sufficiency of the evidence' " to sustain each, individual conviction rather than on the logical consistency of the overall verdict. *Id.* at 1307 (quoting *United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984)).

 The United States Supreme Court has held that a defendant does not have a right to a reversal of his convictions *ipso facto* because a co-defendant in a joint trial was acquitted. *Harris v. Rivera*, 454 U.S. 339, 348, 102 S.Ct. 460, 465, 70 L.Ed.2d 530 (1981). Therefore, we conclude that the

---

12. While "there are obviously constitutional limits beyond which the States may not go in this regard, .... [t]he applicability of the reasonable-doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. at 210, 211 n. 12, 97 S.Ct. at 2327, 2327 n. 12. *See also McMillan v. Pennsylvania*, 477 U.S. 79, 84–85, 106 S.Ct. 2411, 2415–2416, 91 L.Ed.2d 67 (1986).

same approach which we approved in *Tilden* is also proper when the alleged inconsistency in a jury verdict is due to a mistrial for one or more co-defendants, who are jointly indicted and tried with the person who was convicted. *See State v. Hamrick*, 688 S.W.2d 477, 481 (Tenn.Crim.App. 1985) ("verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency."). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime[s] [of which Walls was convicted] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed. 2d 126 (1979); *see also Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982).

In anticipation of this legal conclusion, Walls' arguments in this Court specifically challenge the sufficiency of the evidence to support his convictions on two counts of robbery and one count of conspiracy. As to the robbery counts, Walls contends that since it is alleged that Hernandez "displayed what appeared to be a deadly weapon, to wit: a handgun," the failure to convict Hernandez precludes his conviction on these counts. With regard to the conspiracy charge, Walls argues that since the indictment alleged that he "and Efrain Hernandez ... did agree with each other" to commit the crime of Robbery in the First Degree, the failure to convict Hernandez necessarily means the State failed to prove all of the material elements of the charge against him. In support of his argument, Walls relies upon this Court's decision in *Johnson v. State*, Del.Supr., 409 A.2d 1043 (1979).

The *Johnson* case involved a defendant who was charged with burglary and conspiracy. This Court reversed the conviction for conspiracy because the jury had not found the defendant guilty of the overt act alleged in the conspiracy charge, i.e., burglary. *Id.* at 1044. This Court refused to sustain the conspiracy charge on the ground that the overt act may have been committed by an unnamed co-conspirator, since no such allegation was set forth in the indictment. *Id.* We find Walls' case to be distinguishable from *Johnson*.

■ The State presented evidence to the jury that Walls *and someone else*, alleged to be Hernandez, committed the criminal activity set forth in nine counts of the indictment. Unlike *Johnson*, the issue at Walls' trial was the identity of *two* perpetrators. In court, the Pancoasts identified Walls and Hernandez as their assailants. The jury, as the sole trier of fact, was entitled to give to this identification testimony as much or as little weight as they found it to be worthy. *Tyre v. State*, Del. Supr., 412 A.2d 326, 330 (1980). Unfortunately for Walls, the jury gave great weight to the Pancoasts' identifications of him and less weight to their identifications of Hernandez.

In a joint trial, the guilt or innocence of each defendant must be considered individually. *Williams v. State*, 176 Ga.App. 503, 336 S.E.2d 367, 369 (1985). Viewed in its entirety and including all reasonable inferences, the evidence sufficiently warranted a jury determination that Walls was with *someone* who held a handgun during the robbery [13] and that Walls conspired with that *"someone"* [14] to commit the robbery.

---

**13.** The applicable statute provides that "[i]n any prosecution for an offense in which the criminal liability of the accused is based upon the conduct of another person ..., it is no defense that ... [t]he other person ... has previously been acquitted thereof." 11 *Del.C.* § 272(2). *See also Delaware Criminal Code with Commentary* § 272 commentary at 50 (1973) ("There is no reason why an accomplice should escape liability unless the reason for the principal's acquittal [is] relevant to the accomplice's guilt....").

**14.** *See* 11 *Del.C.* § 523(b). The commentary to Section 523 provides in part:

Section 523 takes what the Model Penal Code commentary calls a "unilateral approach." That is, attention is focused on each individual's culpability.

. . . .

It is a well-settled principle of law that a man may be convicted of conspiracy, if there is proof of agreement and an overt act, despite the failure of the State to apprehend or convict the other conspirators, unless, perhaps, the reason for failing to convict them is

The allegation in the indictment that this "someone" was Efrain Hernandez does not negate the sufficiency of the evidence to support Walls' convictions of Robbery and Conspiracy. *See State v. Cole,* Del.Ct.Gen. Sess., 114 A. 201, 205 (1921).[15] *Cf. Commonwealth v. Byrd,* 490 Pa. 544, 417 A.2d 173, 176–79 (1980). The Pancoasts' in-court identifications of Walls, considered in the light most favorable to the prosecution, provided a rational basis to support the jury's verdict that Walls was guilty of robbery, conspiracy and all of the other crimes with which he was charged. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789.

■ Walls' final argument concerning Hernandez's "mistrial" is that the acquittal of (or failure to convict) one or more defendants named in a joint indictment creates a variance between indictment and proof. *Cf. Harley v. State,* Del.Supr., 534 A.2d 255 (1987). However, we find that it is generally recognized that "[a] variance between an indictment charging an offense involving several persons and proof establishing the guilt of only some of them is not material." 41 Am.Jur.2d *Indictments and Informations* § 270, at 1045 (1968).

This general rule has application in Walls' case, for the reasons we have already stated. The exact identity of the co-participant in the crimes at the Pancoasts' home was not an essential element of the charges against Walls. The joint indictment gave Walls fair notice of the charges against him and that he was alleged to have engaged in that criminal activity with another person. *Cf. Harley v. State,* 534 A.2d at 257.[16]

### *Sufficiency of the Evidence—First Degree Burglary*

Section 826 of Title 11 of the Delaware Code provides, in pertinent part, that "[a] person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling at *night....*" 11 *Del.C.* § 826 (emphasis added). "Night" is defined as the "period between 30 minutes after sunset and 30 minutes before sunrise." 11 *Del.C.* § 829(c). Walls argues that his conviction for First Degree Burglary must be vacated because the State failed to produce direct testimony that the burglary occurred thirty minutes

so related to the liability of the defendant that convicting him while acquitting the others would violate due process and deprive him of equal protection of the law. The present Code made no change in these principles. *Delaware Criminal Code with Commentary* § 523 commentary at 149–50 (1973). In *Saienni v. State,* Del.Supr., 346 A.2d 152 (1975), the defendant's conviction for conspiracy was affirmed where his co-conspirator was a police agent who had no intention of committing the crime.

**15.** In *Cole,* a proper jury charge in a conspiracy trial included the following statement:

There being three defendants in the case the jury may find any one of several verdicts.... They may find a verdict of guilty as to all defendants, they may find a verdict of guilty as to two and not guilty as to one, *they may find a verdict of guilty as to one and not guilty as to two,* or they may find a verdict of not guilty as to all three.

*State v. Cole,* 114 A. at 205 (emphasis added). *Cf.* Annotation, *Prosecution or Conviction of One Conspirator as Affected by Disposition of Case Against Co-conspirators,* 19 A.L.R.4th 192 (1983).

**16.** In *Harley,* the defendant was accused in the indictment of striking the victim with a "tire iron." 534 A.2d at 256. At trial, the evidence

clearly indicated that the "ratcheted support bar of an automobile tire jack stand" was actually used to inflict the injuries upon the defendant. *Id.* The jury convicted the defendant of Assault in the Second Degree and Possession of a Deadly Weapon during the Commission of a Felony. On appeal, this Court reversed the conviction for Possession of a Deadly Weapon during the Commission of a Felony because the nature of the instrument used was an essential element in the charges against the defendant. *Id.* at 257. The alleged use of a "tire iron," when the evidence indicated a part of a "tire jack stand" was actually used to commit the assault, created such a "variance and resulting ambiguity" between the crime charged and the resulting conviction to amount to substantial prejudice to the defendant. *Id.* Nevertheless, in *Harley,* with respect to the assault charge, the conviction was affirmed on the following basis:

[T]he exact nature and description of the instrument used during the altercation is not an essential element of the crime. The indictment fairly informed the appellant of the basic charge of assault. Appellant's substantial rights were not prejudiced as to the assault charge by the limited variation between the wording of the indictment and the evidence as to assault....

*Id.*

after sunset. In support of his argument, Walls relies on *Blankenship v. State*, Del. Supr., 447 A.2d 428 (1982).

In *Blankenship*, the victim testified that the burglary took place at 5:12 A.M. The defendant's father testified that the sun was just beginning to rise at 5:45 A.M. when his son came home. The State did not introduce evidence of the official time of sunrise on the date of the offense charged. This Court held that the record did not support a conviction of First Degree Burglary because the State did not carry its burden of proving the "at night" element of First Degree Burglary. *Id.* at 433.

 In its case against Walls, the State introduced a report of the National Oceanic and Atmospheric Administration, for the purpose of establishing the weather conditions and wind chill factor on December 14, 1985. This report recorded the time of sunset on the day in question to be 4:39 P.M. Mr. Pancoast testified that the burglary at his home took place at approximately 8:45 P.M. on December 14, 1985. Mr. Pancoast also testified that it had been dark outside for approximately two hours. We conclude that a rational trier of fact, viewing the evidence in a light most favorable to the State, could have found Walls guilty beyond a reasonable doubt of First Degree Burglary. *Davis v. State*, 453 A.2d at 803. We find Walls' argument to the contrary to be without merit.

### Prosecutor's Closing Argument

Walls contends that portions of the State's closing argument to the jury were improper and operated to deny him a fair and impartial trial. Specifically, it is alleged that the prosecutor: impermissibly commented on the courtroom demeanor of Walls; characterized Walls and his witnesses as liars; impermissibly referred to photographs of Walls as "mug shots"; and argued that the identification of Walls at the police photographic line-up was not suggestive, in violation of a trial court suppression order.

 Walls' trial attorney did not object to any of the prosecutor's remarks. "This Court has repeatedly emphasized the necessity of making timely objections to closing remarks by opposing counsel which are arguably improper." *Michael v. State*, Del.Supr., 529 A.2d 752, 762 (1987); *see also Hooks v. State*, Del.Supr., 416 A.2d 189, 203 (1980). The failure to make a contemporaneous objection to remarks made in a closing argument generally constitutes a waiver of the right to subsequently raise them as alleged errors on appeal. *Goddard v. State*, Del.Supr., 382 A.2d 238, 242 (1977).

Since there was no objection at trial, our standard of review with respect to the challenges now presented by Walls is to determine whether any of the statements in the prosecutor's closing argument were improper. If so, this Court must determine whether any improper remark by the prosecutor amounted to plain or fundamental error, so as to "clearly deprive [Walls] of a substantial right, or ... clearly show manifest injustice." 24 C.J.S. *Criminal Law* § 1669, at 1057–58 (1961) *quoted in Ward v. State*, Del.Supr., 366 A.2d 1194, 1197 (1976); *Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 856 (1987). Each of Walls' contentions will be addressed in turn.

 Walls alleges that the prosecutor improperly characterized him and his witnesses as liars on several occasions during his closing arguments. An example of the alleged error in the prosecutor's argument is the following:

Certainly, the defendants are biased. They have a big stake in the outcome of the case and I'm not suggesting to you since all the defendants have a stake in the outcome, all defendants lie. That wouldn't be fair. And I'm not saying that at all.

We find nothing improper in these statements. The prosecutor's remarks, in the context that they were made, did not label Walls or his witnesses as liars. *See Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981).

 Walls' next contention is that the prosecutor's argument that the photographic line-ups were not suggestive, was

in violation of the Superior Court's suppression order. In his closing statement, the prosecutor stated to the jury that:

> I asked some questions for precisely that reason about whether they [the Pancoasts] saw a number of people's photographs at the same time, whether they were all the same sex, whether they were the same approximate age range, similar facial features. The reason is to show that this was not done in a suggestive way and would not have caused them [the Pancoasts] to misidentify anyone.

We find that these remarks made by the prosecutor were within the bounds of the Superior Court's earlier ruling.[17] The remarks were directed at rebutting the suggestion by Wall's attorney that the in-court identifications were tainted by the pretrial photograph, i.e., line-up shown to the Pancoasts by the police. The prosecutor "is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from [the] evidence" presented at trial. *Hooks v. State*, Del. Supr., 416 A.2d 189, 204 (1980) (citing *State v. Mayberry*, 52 N.J. 413, 245 A.2d 481 (1968), *cert. denied*, 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969)).

■ Walls next argues that the prosecutor's use of the term "mug shots" was improper and "served to inflame the prejudice and passion of the jury." The Court has previously observed that use of the term "mug shot" has long been condemned because of the inference that the defendant has been in prior trouble with the police, and is thus "incompetent and prejudicial." *Scott v. State*, Del.Supr., 521 A.2d 235, 241 (1987). The State contends that since the mug shot statements were made in refer-

ence to Walls' arrest for the instant offenses, the concerns addressed in *Scott* were not present in this case.[18] Even though the photograph in question was taken by the police at the time when Walls was arrested for the instant offenses, we find that the use of the term "mug shot" at his trial was improper.

■ This Court has "adopted a three-prong test for determining whether improper prosecutorial remarks have prejudicially affected substantial rights of the accused and require the reversal of a conviction." *Hughes v. State*, 437 A.2d at 571; *see also Brokenbrough v. State*, 522 A.2d at 856. The factors the Court must look to in making this determination are: "(1) the centrality of the issue affected by the alleged error; (2) the closeness of the case; and (3) the steps taken to mitigate the affects of alleged error." *Brokenbrough v. State*, 522 A.2d at 856 (citing *Hughes v. State*, 437 A.2d at 571). We will apply that test to this case.

■ First, we find that Walls made no objection to any of the allegedly improper remarks made by the prosecutor during his closing arguments. As a result of Walls' failure to object, no steps were taken to mitigate the effect of the prosecutor's reference to Walls' photograph as a "mug shot." Second, we find that the "mug shot" references were made in the context of Walls' appearance at the time of his arrest.[19] Walls' appearance at the time of his arrest was not a central issue in this case. Third, we find that, because of the eyewitness identification of Walls made by the Pancoasts in court, the State's case against Walls was strong. We conclude

---

17. The Superior Court granted Walls' motion that the jury be informed that the victims had previously seen photographs of the defendants. The purpose of this ruling was to allow Walls to argue that the Pancoasts' in-court identifications may have been tainted. The State was permitted to show the jury that when the Pancoasts were provided with photographs of the defendants, they were also provided with photographs of other individuals. The purpose of this ruling was to permit the State to argue that the photographic array actually presented to the Pancoasts was not unfair or biased.

18. The prosecutor's initial reference to "mug shot" occurred as follows: "Take a look at this mug shot. Take a look at how he looked when arrested."

19. The prosecutor argued to the jury that the police photograph discredited Walls' testimony that he was usually well groomed. The prosecutor also argued that the police photograph was consistent with the victims' testimony that Walls had long hair at the time of the crimes.

that in the context that it was used in this case, the prosecutor's reference to Walls' "mug shot" did not amount to plain error. *See Brookins v. State*, Del.Supr., 354 A.2d 422, 425 (1976).[20]

Finally, Walls submits that the prosecutor improperly argued to the jury that his courtroom demeanor did not measure up to a stereotypical norm exhibited by an innocent defendant.[21] The State acknowledges that this Court has previously held that "the courtroom demeanor of a defendant who had *not* testified is irrelevant. His demeanor has not been entered into evidence and, therefore, comment is beyond the scope of legitimate summary." *Hughes v. State*, 437 A.2d at 572 (emphasis added). The State distinguishes this case from *Hughes* because Walls did testify. The State argues that "where the [prosecutor's] remark [about the defendant's personal appearance or demeanor] is with respect to the accused's appearance while testifying" the prosecutor's comments may be proper. *Campbell v. State*, 65 Md.App. 498, 501 A.2d 111, 114 (1985), *cert. denied*, 305 Md. 599, 505 A.2d 856 (1986).

We agree that it is possible to make proper comments to a jury about the demeanor of a defendant who has testified. *Id.* However, we do not find that the prosecutor's comments about Walls' were necessarily limited to the context of his demeanor as a witness. In addition, irrespective of the context, the prosecutor's inference that there is such a thing as "normal" courtroom behavior was improper. *Hughes v. State*, 437 A.2d at 572.[22] Nevertheless, after applying our three-prong test, we find that all of the prosecutor's remarks about Walls' demeanor, "when viewed in the context of this case, [were] not such as to undermine the fundamental fairness of the trial, did not contribute to a miscarriage of justice, and [were] not plain error." *Michael v. State*, Del. Supr., 529 A.2d 752, 764 (1987).

### Kidnapping

Walls contends that his convictions for kidnapping should be reversed because the Superior Court committed plain error in its instructions to the jury, by omitting a critical element of that offense.[23] The State

20. In *Brookins,* we held that use of the term "mug shot" by prosecution and witnesses was harmless error "given the strong and positive in-court identification of defendant by the two eyewitnesses." 354 A.2d at 425.

21. Specifically, the prosecutor argued:
Another thing, I think you ought to consider about Mr. Walls in evaluating his demeanor and deciding what you do and don't believe, and that's his attitude or behavior in court. As you will hear from Judge Martin, the demeanor of a *witness* is something you should consider. Joseph Walls, as you must have noticed found humor at what was going on at times when nothing was funny. This didn't seem to be serious to him. This is not a funny case....
If he were innocent and wrongly accused and misidentified as he'd have you believe, do you think he'd be acting that way in court? Or do you think he's [sic] be sitting still, scared and quiet, sitting respectful at all times?
(emphasis added).

22. In *Hughes,* we noted that:
The practice is also suspect because it assumes that there is such a thing as a model of "normal" courtroom behavior. And that is dangerous: one may reveal or conceal emotion for innumerable reasons, and a defen-

dant should not be subjected to a guilty verdict because his courtroom appearance did not comport with the prosecution's notion of a norm. The practice would necessarily give the prosecution 20–20 hindsight in every summation (after having observed a defendant throughout trial) and would encourage an appeal to the jury's passion rather than to the evidence.
437 A.2d at 572.

23. The charge to the jury on the kidnapping counts was given as follows:
As to Counts IV and V, kidnapping second degree, the statute reads in pertinent part:
A person is guilty of kidnapping in the second degree when he unlawfully restrains another person to commit the commission of any felony.
In order to find these defendants guilty of kidnapping second degree, you must find that the following elements have been established beyond a reasonable doubt:
One, the defendants restrained Anna Pancoast and Justin Pancoast. "Restrained" means to restrict another person's movements intentionally or in such a manner as to interfere substantially with their liberty by moving them from one place to another or by confining them either in the place where the restriction commences or in a place to which they have been moved without consent.

agrees with Walls' position. The State submits that as a result of this "plain error," Walls' two second degree kidnapping convictions must be vacated. The State's exact position is set forth in its brief, as follows:

> The kidnapping instructions in this case were fatally defective in that the trial judge omitted from the instructions a critical element of the offense, that the restraint be imposed for an unlawful purpose, here to facilitate the commission of robbery first degree. In essence, the instructions permitted the jury to convict defendant of second degree kidnapping upon finding the elements of second degree unlawful imprisonment. *Compare* 11 *Del.C.* [§] 783 and 11 *Del.C.* [§] 781. The State submits that this omission was plain error and, consequently, that Walls' two second degree kidnapping convictions must be vacated.

▮▮▮ The State's confession of error in Walls' appeal "is in accordance with the highest traditions of the Delaware Bar and the prosecutor's unique role and duty to seek justice within an adversary system." *Weddington v. State,* Del.Supr., 545 A.2d 607, 616 (1988). However, "[a] confession of error does not *require* the reversal of the judgment of conviction in the trial court. Despite [the confession of error], ... this Court must make an independent determination that a reversible error was committed." *Id.* at 612.

▮▮▮ We have undertaken that review. We find that Walls' argument, which is joined in by the State, is legally correct. We hold that the omission of an element of the kidnapping offense from the instruc-

tions, to the jury, constituted reversible error.[24]

### Conclusion

Walls' convictions for Second Degree Kidnapping are REVERSED. The judgments resulting in Walls' convictions for one count each of First Degree Burglary, Second Degree Conspiracy, Terroristic Threatening, and Possession of a Deadly Weapon during the Commission of a Felony, and two counts each of First Degree Robbery and Second Degree Assault are AFFIRMED.

---

A person is confined without consent when the movement or confinement is accomplished by physical force, intimidation, or deception, or by any means including acquiescence of the victim, if he is a child less than 16 years old and the parent having lawful control of him has not acquiesced in the movement or confinement.

Element Two, the defendants acted unlawfully; that is, they acted without legal authority or permission.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendants acted in such a manner as to satisfy both of the elements which I have just stated, at or about the date

and place stated in the indictment, then you should find the defendants guilty of kidnapping second degree. If you do not so find, then you should find the defendants not guilty of kidnapping second degree.

24. We do not address the merits of Walls' contention that the evidence failed to support a conviction for kidnapping or the State's response to that argument. Those arguments should be addressed by the Superior Court, in the first instance, in the event that there is a new trial. *Weber v. State,* Del.Supr., 547 A.2d 948 (1988).